Case number 23-1759. Darrell Wilcox and Michael McGuire, individually and as representatives of a class of participants and beneficiaries in and on behalf of the Georgetown University Defined Contribution Retirement Plan, the Georgetown University Voluntary Contribution Retirement Plan, a balance, versus Georgetown University et al. Mr. Bloom for the balance, Ms. Zaharsky for the apologies. May proceed. Good morning, Your Honor, and may it please the court. My name is James Bloom from the firm Schneider-Wallace-Cattrell-Koenigke on behalf of plaintiffs' appellants, Brian Wilcox and Michael McGuire, who bring their claims on behalf of the Georgetown plans. And we respectfully request that the court reverse the district court's decision denying leave to amend and remand the case to the district court with instructions to grant plaintiffs' motion for leave to file the proposed amended claim. So ERISA, the Employee Retirement Income Security Act of 1974, was designed to protect employee retirement savings. And to achieve that purpose, ERISA imposed strict fiduciary duties of prudence and loyalty on those responsible for administering retirement plans, as defendants were responsible for administering the Georgetown plans that issue this case. And I would indicate that when you have a motion to amend, it doesn't seem that hard to have a court grant it and give you the opportunity to cure any deficiencies, but you know, you just can't be futile. And it seems that here, you're not alleging direct wrongdoing by Georgetown, that you're kind of putting together more of a circumstantial case, because you're using terms that say they may have failed to prudently damage and monitor the plan. And so that's where some of the rub comes, because do you just open it up where you have to get all your discovery to then prove your case without on the front end, meeting your rule 11 requirements, where you have done some discovery, you've done some investigation, and you then have enough information to support a plausible claim? Well, Your Honor, I would respond to that in two different ways. I think that as the complaint alleges, there's both direct and circumstantial evidence of a flawed fiduciary process in this case. The direct evidence includes fees we know the plan participants paid, which in this case were more than five times the national median according to the analysts and consultant studies cited in the complaint. Some of that is even for issues with respect to standing about fees played into those particular plans though, correct? Well, Your Honor, let me take this one piece at a time if I may. So the standing question is whether, is sort of a two-step question in this case. There's no doubt that the individual plan participants, the named plaintiffs in this case, Mr. Wilcox and Mr. McGuire, invested in some of the imprudent funds and paid the excessive record-keeping fees described in the case. The only question is whether they have enough standing to seek relief on behalf of all of the funds in the plan or on behalf of the plan for all of the funds, regardless of whether they invested in them personally. And there the case law is unanimous in our favor, in plaintiff's favor. You've got the Third Circuit's decision in Boley. I don't believe we cited it in the brief,  I saw the Eighth Circuit's decision in Braden versus Walmart. Both stand for the proposition that once a plaintiff establishes that they have standing to bring relief on behalf of the fund for at least, or on behalf of the plan with respect to at least some of the challenge conduct, as long as there's a conceptual link, they can seek- I think those cases say there needs to be more than a conceptual link, right? It says the same course of conduct. So for example, maybe those cases would apply if you invested in one of the plans and retail shares only were offered. And you said a prudent fiduciary would have secured institutional class shares for this and all the other funds that we also didn't invest in. Then maybe you could challenge that share class issue for funds you didn't invest in. But that doesn't seem analogous to what's going on here. You're not challenging. There isn't another retail class share that you invested in. Well, your honor, I would argue that when you're talking about an investment lineup of nearly 400 investment funds, like you have here, you're going to have a plan that is replete with problems in the way the funds were selected, including that. And I would say that turning back to the Braden versus Walmart decision, cases like this invariably rely on information at the leading stage about what the participants can deduce from the publicly available documents. And here, I think the critical thing to consider is the Supreme Court's decision in Hughes versus Northwestern University, and then the Seventh Circuit's consideration of that decision on remand. Is there you had a startlingly similar alignment of problems with the way the plan had been managed. You had hundreds of investment options. You had retail share class funds and a plan with billions of dollars in assets. And you had multiple record keepers when the national standard is to have a single record keeper. Having multiple record keepers just inflates the fees that participants have to pay. And when you apply that to this case, you see all of those same problems. And the import of the Supreme Court's decision in Hughes is that when you have that alignment and you have that set of problems, it's strongly suggestive of the fact that there was fiduciary imprudence and that that cost the participants. So give us a little more specific. So on your record keeping claim, the basic idea is you should infer there was an imprudent process because the fees here were really high and fees for other plans were lower, right? Your, I think one difficulty for you that the district court focused on is that your own complaint acknowledges in paragraph 64 that the record keeping fees for plans differ on a whole host of factors. And then when you turn to comparing the fees here to the fees charged to other plans, you don't include any details about any of those factors. Can you sort of address that point that the district court made? Well, I would say this, your honor. I think that the district court might've read too much into paragraph 64 of our complaint. These record keeping services are standardized nationwide. And as we alleged, I believe in paragraph 63 and paragraph 62, that the primary differentiator between record keeping service providers is price, that they provide precisely the same lineups of services for different plans. And that it is possible for plans to achieve the same level of services at a lower price. And that's really the core of our allegation there. I still don't get something. You're, pardon me, individual planners didn't invest in any of the funds that suffered from defects in that, the alleged defects in that fund, correct? No, your honor, that's not quite right, respectfully. The plaintiffs did both invest in funds that had unnecessary fees and that had been imprudently selected. There are a host of problems with the nearly 400 funds in the plan. What about the ones in which they invested? Yes. What are the problem? What do they invest in and what is the problem with that investment? Well, the plaintiffs, for example, Plaintiff Wilcox invested in the TIAA traditional annuity, which has the 10-year lockup provision and the 2.5% withdrawal fee. How is that affecting him now? What's the harm? Well, he can't take his money out without suffering these. He can't even move his money to a different investment option if he thinks that equities or bonds might be a better place for him. There's no allegation that that's what he wants to do or that he's about to do that, if only he could. Nothing to that effect. That's correct, your honor, because we don't think it's frankly necessary to allege that a particular plaintiff would do that, but for these withdrawal restrictions. Well, you might want to read the Lujan case again on imminence. The harm has to be either present or at least imminent. When does this, just to make sure I understand the restriction, if he wants to move his money today into a different fund, he cannot do that? Does that apply also at retirement time? At retirement time, he can take an immediate withdrawal, but then he pays the 2.5% surrender charge. Okay, he's not at retirement time. He's not at retirement time. He just wants to move his money into a different fund. Well, I think the way to look at this, your honor, is the implication of defendant's argument that he should have made the request prior to filing the suit. No, I'm not suggesting that. If the rules prevented, that would have been futile to require him to make the request, but he's made no allegation that this is what he will do, if only he could. I think that whether he would want to do that today or whether he'd want to do that a year from now, it really makes no difference. Well, then you ought to reread the case. It's got to be imminent. Well, I think that here- A someday plan. That's the phrase, a someday plan or intention to do something is not sufficient. I think this is a very different circumstance because in the Lujan case, you had individuals who were concerned about potential access to the natural environment. This is this man's retirement savings, and it's locked up in this fund. And whether today, tomorrow, three years from now, he decides he wants to get that money back, he can't do that. There are hundreds of cases applying Lujan, literally hundreds of cases. You obviously are familiar with Lujan itself. Thank you. But, and that imminence requirement has been constant. There has to be an allegation of that sort. In fact, now we see these in the environmental cases that follow Lujan. The organizations, the Sierra Club and so on, they're always careful to point out that a person has been using the facility, wants to continue or would no longer be able to do so. Something that is concrete in the present or immediate and certain future. Well, I think that part of the difference here is that he needs to be able to make his decisions about where he wants to have his retirement savings, depending on changes to the market that he may not be able to foresee today. They didn't even allege that. I think that is, we would consider that to be a legal argument. I'd also note that retirement is sort of inevitable. This will come to pass. It will affect him sooner or later. Well, that certainly won't qualify as a, it's true, but it's not. Right, well, I mean, I think that it's a present ongoing violation of his rights to access his own retirement savings and invest it in a way that he sees fit without incurring this 10-year lockup charge. I'd also note that neither the defendants nor the district court cite a case ever in the nearly now 50 years since ERISA was adopted holding that a participant lacked standing to challenge a fund that they actually invested in. Here, I think that going back to a question that Judge Childs asked earlier, how do we infer a fiduciary process violation? Here, I think you have to look at the allegations and the complaint as a whole, read the complaint holistically. And what you see is the record-keeping administrative fees as much as five times higher than the national average or the national median for comparable plans, the multiple record keepers, the 400 investment options, the lower cost investor share class funds that were available, the TIA variable annuities, which had many layers of unnecessary fees, the traditional annuity with its 10-year lockup period and withdrawal fee, and the inaccurate information in the 5,500s that were provided to plan participants and to the Department of Labor. All of that, when you read those allegations together, suggests that defendants were asleep at the switch and not performing their fiduciary applications. Thank you. You may proceed. Good morning, I'm Nicole Saharsky for Georgetown. So two different district courts took a close look at the complaints here and determined that they failed. Both because of lack of standing on some of the claims and because of failure to state a claim. And they gave plaintiffs the opportunity to replead, essentially a third bite at the apple, and plaintiffs didn't take it, but instead came to this court. I think that the primary argument that plaintiffs are making here are not about the allegations in this complaint, but perhaps about what other courts have done. And so I just wanted to address that at the outset. Every court that has addressed claims like this have recognized that they are context-specific, that the duty of prudence is context-specific. It depends, as the statute says, under the circumstances then prevailing, under the plan then prevailing, what would a prudent person do? And the Supreme Court in the Hughes case reaffirmed that. It said, this is a context-specific inquiry. And so when you look at the claims in this case, there are different claims in other cases, there are different plans at issue in other cases, but the claims in this case failed to state a claim. And that's what the two district courts that did the hard work here determined. In particular, the court looked at the allegations that the particular complaints, the particular counts in the complaint, and said, there's not an overall cause of action under ERISA for overall plan mismanagement. There has to be a claim of breach of fiduciary duty. And what are the exact claims that are at issue here? And so the court started with the claim with respect to record-keeping fees, and said, okay, the fundamental problem here is that there are allegations that the fees are too high, but how does that compare to the services that are offered? And so the court, with respect to the first complaint, the court in the first decision said, I've got three problems here. First, that there's not a comparison to plans that are like this one, that have services like this one. And second, in particular, an important feature of these plans is that they include TIAA annuities, which are long-term plans that are more expensive to record-keep, and there's no allegations that these other plans with lower fees have the TIAA annuities. And then the court said there's a third problem, which is there's this claimed fee of $35, but no factual support for it. And so the court gave plaintiffs an opportunity to replete and then said, you know, none of those deficiencies were cured. And I think the court appropriately said, you know, we just need some benchmark here. And that's the same thing that many other courts of appeals have said, in, for example, the Matusik case in the Eighth Circuit, the Matney case in the Tenth Circuit, Common Spirit in the Sixth Circuit, the Albert case in the Seventh Circuit. And I guess what I would say is- And were those all motions to dismiss, not summary judgment? Yes, those were motions to dismiss. So, Counsel, what is your rule? So what level of detail about other plans should be required before a claim like this can proceed? So Twombly and Iqbal says that there has to be something that pushes the allegations from possible to plausible. And in the context of record-keeping fees, what would push it from possible to plausible is some allegation about other plans that are like this plan, that have the same level of services. And so if you look at what the plaintiffs in this case have alleged, they talked about five other university plans, but they don't even tell us the record-keeping fees for four of those five plans. So we don't know what the fees are. And then they don't tell us the services for the other plans. Are the services, maybe you could explain what you mean by services, but is that publicly available information? Yes. So I think the plaintiffs are talking here about record-keeping services. I'll note that in the district court's opinion on page 31, the court, this is in the second opinion, the court has some frustration because the plaintiffs are kind of inconsistent about what services and what fees they're talking about. But I understand them to be talking about record-keeping fees. And I think there is, obviously the plaintiffs had the information about the fees in their plans because they're participants in the Georgetown plan. There is a significant amount of publicly available information about other plans. We gave an example in our brief about the Pepperdine plan. We gave other examples below. Now the district court said, I'm not gonna look at that stuff unless plaintiffs pleaded it, right? Because I have to just focus on the complaint and focus on the allegations there and take them as true. But there is publicly available information that exists, especially because as your honor know, there are a lot of other university cases that have been brought against other universities. And so a lot of information has come out in those cases. Right, so in this case, they have the five examples of the other universities. If they alleged each of these pays only $35 for record-keeping services, and each includes a mix of mutual funds and annuities like Georgetown's plan, is that enough? That's a lot better. Probably it's enough. It would just be a question of, does it have like a TIA annuity like this plan? But I guess what I would say is we're not even close to that here. Like we're not this, we're very far away from that as a line. I mean, here they tell us for each of these that there was one record keeper, but they don't tell us what the funds were and they don't say whether they were TIA annuities. Actually, it kind of suggests that at least one of them didn't have TIA annuities. So we're not saying that, you know, there aren't allegations that, you know, potentially could be pled that would be sufficient. Obviously, there are some cases that have gone forward, like in the Seventh Circuit, for example. We're saying that the allegations in this case are really sparse and just don't push over the line. I wanted to ask about that, because the Seventh Circuit Hughes complaint seems quite similar. And I'm just wondering how you would have us distinguish that complaint, or if you really just think that decision is wrong. I think it is distinguishable and the answers for why it's distinguishable are in the Hughes decision itself. The Seventh Circuit there is very careful in parsing through the allegations in the complaint. And the ones that it focuses on that are not present here are first of all, that there were other record keepers that were equally capable of providing the same services. The second was an allegation that Northwestern had not solicited bids or sought rebates. And then the third, which the Seventh Circuit found very important is that there was an allegation that Northwestern actually had consolidated and reduced the fees, which showed that it was doable in those circumstances. And I urge you to look at the Seventh Circuit's opinion, because it goes very specifically through the allegations and it makes very clear that this is a context-specific decision. And the other thing it does, which we find, I think, very helpful is that it distinguishes between that case and a prior case in Albert. There's this case, Albert versus Oshkosh, which was also a record-keeping case in the Seventh Circuit. And the Seventh Circuit explains, like here's why the allegations in this case are sufficient, but the allegations in this other case aren't sufficient. And so- For the third reason you gave, I'm quite sure that if one of your clients made a change, you would ask us not to use that as evidence of imprudence in sort of a hindsight way. And on the first point, you're right. This complaint doesn't use the words equally capable, but paragraph 62 says, there are numerous record keepers in the marketplace capable of providing a high level of service to large defined contribution plans like plans. To me, that seems very generic, but it also seems that's just another way of saying there's other equally capable record keepers out there. So do you disagree with that? Well, I don't think it says equally capable. I think it is, as you say, pretty generic, but I guess if I were looking at the allegations in this complaint, as opposed to, for example, the Hughes complaint, there are pages and pages about record keeping and the ability, the kind of equally capable and ability of others to record keep, whereas we're just talking about one paragraph in this complaint. So if you just look like at the sheer amount of allegations kind of on this point, they are much more detailed in the Hughes case. And I do think at the pleading stage, an allegation, this third allegation that you spoke to, this allegation that it could be done is something that raises this factor of plausibility. Now, do I think at trial that that would establish imprudence? No, but where we are now is that there needs to be something that pushes into plausibility. And I guess the point I would make about kind of the Seventh Circuit cases and perhaps some of the other cases is that there is the same legal rule that is being applied, and it's just different outcomes in different cases because of different allegations. And the allegations here are just sparse. They're just very sparse about what's saying what Georgetown allegedly did wrong. And if you look at this kind of question, you asked, Your Honor, about like what is the legal rule that we would apply? This legal rule that you need some similar plan, comparator, benchmark, whatever you call it, like that is throughout the courts of appeals. That's in the Sixth Circuit in common spirit. That's in the Seventh Circuit in the Albert case and in the Hughes case, I think also says it. It's in the Eighth Circuit. It's in the Tenth Circuit. The Third Circuit said it in Suedas. So we think the legal rule is the same. It's just the application of that legal rule to this particular case. I guess the other thing I'd say is that there are three different counts here. And while plaintiffs, I think, sometimes jumble them all together and say, oh, courts have allowed these to proceed. I think where some courts have allowed them to go forward on the record-keeping fees is on the record-keeping fees. But with respect to these other counts, there are not cases that allowed them to have gone forward. For example, on their too many options claim, like there are too many options, that's been routinely rejected at the motion-to-dismiss stage, including by the Hughes remand, in the Hughes court in the Northwestern case on remand. NYU, Yale, the Northwestern case, all rejected because of no pleading of injury as a result of that. And that's something the district court pointed out here and the plaintiffs just didn't have a response. I think the last thing I'd mention  as to potential issues with standing. We do think that there's a lack of standing just on two particular claims, the Vanguard share classes, because there's no investment in those claims for the reasons you stated, Judge Garcia. And then with respect to the TIAA annuity withdrawal restrictions, essentially for the reasons that you stated, Judge Ginsburg. And so I guess at the end of the day, what I'd say is these courts had, these two district courts had this complaint in front of it. They did their absolute best of working their way through this complaint and said in the first time around, here's what you need to allege plaintiffs and then came back and the plaintiffs didn't do it. And then the plaintiffs didn't want their third chance to do it. And I think it's been six years with this complaint and we would urge this court to affirm. Thank you. You have two minutes for rebuttal. Thank you, Your Honor. I'd just like to respond very briefly to two points my distinguished opposing counsel made. First on the question of too many investment options. I respectfully suggest that defendants get the holding in Hughes II backwards. In Hughes II, the court noted that offering a wide variety of investment options was indicative of prudence, but that the Supreme Court and the Seventh Circuit in Hughes both, and the remand in Hughes, both reversed the motion to dismiss because too many investment options had been offered. Both the Seventh Circuit and the Supreme Court cited that specifically as evidence of imprudence. And as far as a benchmark about when do you go from having a wide range of investment options when you have too many, the Seventh Circuit on remand in Hughes noted favorably that Northwestern had amended their plan to reduce to something like 35 investment options from well below the 400 or so that they and the Supreme Court found had been too many. The other point is about a benchmark and what's in the complaint. Defense counsel argued that there's information in the public about what the record keeping fees were. And that is true. There is information in the public about what the record keeping fees were, but there's a claim here that's well supported by the evidence cited in the complaint that the information provided to participants was incomplete and in some ways inaccurate. So we have based the complaint on the information that's out there, but we also note that we have grave concerns about that information. I think that if you look at the comparison Seventh Circuit made in Hughes between that case and Oshkosh, it's clear that this court should reverse applying the same rationale here. All of the allegations that the Seventh Circuit said were present in Hughes are present in the first amended complaint in this case. We have, I can assure you, pages of allegations in the complaint about what record keeping services are, what the appropriate price for that would be. We do allege, I think the distinction is whether equally capable of providing the high level of services. The phrase we used in the complaint was capable of providing the high level services. And with that, thank the court for its time. Thank you very much. The case is submitted.
judges: Childs, Garcia, Ginsburg